In re MARVEL ENTERTAINMENT GROUP, INC.; the Asher Candy Company; Fleer Corp.; Frank H. Fleer Corp.; Heroes World Distribution, Inc.; Malibu Comics Entertainment, Inc.; Marvel Characters, Inc.; Marvel Direct Marketing Inc.; and Skybox International, Inc., and Marvel Enterprises, Inc., Debtors.

No. CIV.A.97–638–RRM.

United States District Court, D. Delaware.

Feb. 26, 2002.

David B. Stratton, Pepper Hamilton LLP, Wilmington, DE, for Debtors.

Kathleen M. Miller, Smith, Katzenstein & Furlow LLP, Wilmington, DE, for Snyder Ventures, Inc.

## MEMORANDUM OPINION

MCKELVIE, District Judge.

This case presents issues of contract interpretation relating to certain claims that have been brought in the bankruptcy case of debtors Marvel Entertainment Group, Inc. and Heroes World Distribution, Inc. The claimant, Snyder Ventures, Inc., is a creditor of Marvel Entertainment Group, Inc.

Snyder Ventures filed two proofs of claim in this case on January 30, 1997. Snyder Ventures' claims arise from an asset purchase agreement dated December 22, 1994 (the "Agreement") among Marvel Acquisition Corp., Marvel Entertainment Group, Inc., Superhero Enterprises, Inc., and Ivan Snyder, pursuant to which Marvel Acquisition Corp. purchased substantially all of the assets and assumed substantially all of the liabilities of Superhero Enterprises. According to the claims, Snyder Ventures is the successor in interest to Superhero Enterprises. Following the consummation of the asset purchase transaction contemplated by the Agreement, Marvel Acquisition Corp. was merged into Heroes World Distribution, Inc., a wholly owned subsidiary of Marvel Entertainment Group.[1]

Snyder Ventures' claims 383 and 384 seek $5,322,398 plus interest. The claims are based on a portion of the purchase price that allegedly, pursuant to the terms of the Agreement, was to be paid to it in accordance with a promissory note and an upward adjustment to the purchase price.

The Debtors have objected to the allowance of Snyder Ventures' claims in the Debtors' Tenth Omnibus Objection Seeking to Disallow and Expunge or Reduce

---

1. For simplicity, throughout this opinion the court will refer to Marvel as the purchaser in the transaction, and Snyder Ventures as the seller.

and Allow Certain Claims (D.I.1187). In that objection, Marvel claims that, based on the Agreement, the upward purchase price adjustment sought by Snyder Ventures is not required. Based on its calculations of the proper adjustments under the Agreement, Marvel seeks to reduce the amount of Snyder Ventures' claims by $1,321,605.

On April 16, 2001 Marvel Enterprises moved for partial summary judgment, pursuant to Federal Rule of Civil Procedure Rule 56 and Federal Rules of Bankruptcy Procedure 9014 and 7056, as to Snyder Ventures' claims. The issue presented by Marvel's motion is whether parol evidence of the parties' intentions can be considered by the court to vary or interpret the terms of the purchase price adjustment provision, section 1.3(d)(ii), of the Agreement. Marvel contends that it cannot and that under the only reasonable interpretation of the plain language of the Agreement, Snyder Ventures' claims must be reduced by $1,321,605. After Marvel's motion was fully briefed, the court heard oral argument on the motion on October 9, 2001.

The court has considered the arguments made in support of and in opposition to Marvel's motion. This is the court's decision on Marvel's motion.

## I. BACKGROUND

The following facts are based on the affidavits and documents submitted by the parties.

A. *The 1994 Asset Purchase Agreement and Performance Thereunder*

On December 22, 1994, pursuant to an Asset Purchase Agreement, Superhero Enterprises, Inc., n/k/a Snyder Ventures, sold substantially all of its assets and assigned substantially all of its liabilities to Marvel Acquisition Corp., which later merged into Heroes World Distribution, Inc. The purchase price, as set forth in the agreement, was $7,000,000. The purchase price consisted of (i) $100,000 in immediately available funds to be paid at closing; (ii) a promissory note in the amount of $3,400,000 that was issued by Marvel Acquisition and guaranteed by Marvel, due shortly after closing on January 31, 1995; and (iii) a promissory note in the amount of $3,500,000 that was also issued by Marvel Acquisition and guaranteed by Marvel, due December 28, 1997.

In addition to setting forth the payment structure of the $7,000,000 purchase price, the terms of the Agreement also provided that the purchase price was to be subject to certain post-closing adjustments. These purchase price adjustment provisions are set forth in sections 1.3(c) and 1.3(d) of the Agreement.

The first purchase price adjustment, set forth in section 1.3(c)(i), was based upon Snyder Ventures' "Average Operating Income," which was defined as the average "Operating Income" for fiscal years ended December 31, 1994, 1993, and 1992. In the event that the Average Operating Income exceeded $1,392,000, the purchase price was to be increased by an amount equal to the excess multiplied by six. On the other hand, in the event that the Average Operating Income was less than $1,225,000, the purchase price was to be decreased by an amount equal to the deficiency multiplied by six.

The second purchase price adjustment was based on "Net Other Assets," as that term is defined in section 1.3(d)(i) of the Agreement. Section 1.3(d)(i) defines the term "Net Other Assets" as "the Assets acquired by the Purchaser at the Closing, other than fixed assets, valued at the balances of such assets at December 31, 1994, except that Accounts Receivable shall be valued only to the extent payment there-

fore has been received, less the Assumed Liabilities assumed by the Purchaser at the Closing . . . ." The Agreement further provided, in section 1.3(d)(ii), that for each month after January, 1995, "the Purchaser shall provide to the Seller a calculation showing the Net Other Assets at the end of such month." Section 1.3(d)(ii) then provided that:

> In calculating the Net Other Assets pursuant to this Section 1.3(d), collections of Accounts Receivable acquired at the Closing shall be applied first to the oldest of such Accounts Receivable, unless any particular Accounts Receivable have been disputed by the obligor and as a result thereof, the obligor, with respect to a particular payment specifies the Accounts Receivable to which it is to be applied.

Based on the aforementioned calculations, to the extent that Net Other Assets was greater than zero, the purchase price would be adjusted upward by that amount. If, however, Net Other Assets was less than zero, the purchase price would be adjusted downward by that amount. In that event, Marvel was then to assign the uncollected accounts receivable to Snyder Ventures.

As called for by the Agreement, when the Closing was completed, the $100,000 cash component of the purchase price was paid. Soon thereafter, as provided by the Agreement, the $3,400,000 promissory note was paid when due. However, on December 27, 1996, prior to the payment of the final $3,500,000 promissory note, Marvel filed its voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. The $3,500,000 note was not paid; that amount is subsumed by Snyder Ventures' claims. In addition to seeking payment on the $3,500,000 note, Snyder Ventures also seeks $1,822,398 allegedly due to it based on the two post-

closing adjustments to the purchase price described above.

### B. Post Closing Adjustments to the Purchase Price

#### 1. The Procedure Called For By the Agreement

Sections 1.3(c) and 1.3(d) of the Agreement provide for adjustments to the purchase price based upon post-closing calculations of Average Operating Income and Net Other Assets. The starting point for these calculations was to be the preparation of financial statements by Marvel for the acquired business as of the Closing Date, December 31, 1994, and for the year then ended in accordance with the procedures outlined in section 1.3(b) of the Agreement.

In this regard, section 1.3(b)(i) states that:

> the Purchaser shall prepare a balance sheet and statement of operations for the Business for the year ended December 31, 1994 certified by Ernst & Young, LLP (the "Preliminary Financial Statements"), in accordance with generally acceptable accounting principles ("GAAP") consistently applied with past practice, [with certain exceptions not relevant to this case]. The Seller shall have the right to have the accounting firm of Lawlor, O'Brien & Leskowicz, any "big six" accounting firm or any other accounting firm acceptable to the Purchaser . . . present at the inventory count conducted in connection with the preparation of the Preliminary 1994 Financial Statements.

After the preparation of the Preliminary 1994 Financial Statements, the Seller, Snyder Ventures, was provided with the opportunity to submit objections to the Purchaser, Marvel, provided that such objections were accompanied by a certificate

of an Approved Accounting Firm "certifying its concurrence with the Seller's objections." The Agreement sets forth a detailed mechanism to resolve any objections that Snyder Ventures may have to the preliminary financial statements. First the parties were to use their combined "reasonable efforts" to resolve the objection. If the objection could not be resolved by the parties, section 1.3(b)(iii) of the Agreement states that the parties shall submit their dispute to the Reviewing Accountants, Arthur Andersen & Co., or another mutually agreed upon "big six" accounting firm, for a conclusive and binding final determination as to any objections to the Preliminary 1994 Financial Statements. After all objections are resolved, the resolution is incorporated into the Preliminary 1994 Financial Statements to yield the "Final 1994 Financial Statements." These financial statements are then used to calculate the "Average Operating Income" and "Net Other Assets," which are then used to make the two adjustments described above.

### 2. The Dispute As to How to Calculate Accounts Receivable

Although the Agreement contemplated that Marvel would engage Ernst & Young LLP to prepare 1994 financial statements, it did not do so. Rather, Marvel engaged the firm of Lawlor, O'Brien & Leskowicz ("LOL"), who were the accountants for Snyder Ventures, to prepare the preliminary financial statements and calculations of the two adjustments. Marvel represents that the parties agreed that after LOL prepared the preliminary financial statements and adjustment calculations, Ernst & Young would then assist Marvel in preparing any objections to the LOL financial statements and calculation.

Marvel states in its opening brief in support of its motion that this modification to the procedures set forth in the Agreement was done "for practical reasons" by the parties. However, according to the affidavit of Ivan Snyder, who negotiated the terms of the Agreement on behalf of Snyder Ventures, the parties never agreed to modify the process set forth in the Agreement.[2] Rather, Marvel itself decided to use LOL to draft the preliminary financial statements on its own behalf—and not on behalf of Snyder Ventures—instead of Ernst & Young. Although this was in contravention of the Agreement, Snyder Ventures did not object.

LOL issued its preliminary financial statement and calculation of the two adjustments on February 9, 1996. In calculating the adjustments under section 1.3(d)(ii), the LOL report applied the collection (through December 1995) of cash receipts to the oldest of accounts receivable for that customer. That calculation resulted in an upward adjustment of the purchase price based on Net Other Assets of $1,073,884.33 and an upward adjustment of the purchase price based on Average Operating Income of $748,514, for a total upward adjustment to the purchase price in the amount of $1,822,398.33.

The $748,514 figure for the upward adjustment based on average operating income was arrived at as follows. According to the LOL report, in connection with its calculation of Average Net Income under section 1.3 of the Agreement, Superhero's average operating income for the three years ended December 31, 1994 was $1,516,752. This amount exceeds the threshold amount of $1,392,000 stated in the Agreement by $124,752. Therefore, under the Agreement, Snyder Ventures

---

**2.** Snyder claims that the only modification that the parties did agree to was to wait until the end of 1995 to have the preliminary financial statements prepared.

would be entitled to six times that excess amount; or, $748,514.

According to Snyder Ventures, because Marvel was unhappy with the LOL report, Marvel then had Ernst & Young prepare a report objecting to the calculations in the LOL report. Ernst & Young issued its report on June 17, 1996. In its calculation of the adjustments under section 1:3(d)(ii), Ernst & Young tried to match cash receipts through December 31, 1995 with specific invoices, regardless of whether the invoice to which it was matched was the oldest for that customer. That calculation resulted, in part, in a downward adjustment of the Net Other Assets purchase price adjustment in the amount of $370,235 and a downward adjustment of the Average Operating Income purchase price adjustment in the amount of $1,566,524, for a total downward adjustment to the purchase price of $1,936,759.

The $1,566,524 figure for the downward adjustment was arrived at by Marvel as follows. According to the Ernst & Young report, in connection with the calculation of Average Net Income under section 1.3 of the Agreement, Superhero's average operating income for the three years ended December 31, 1994 was $963,913. The $963,913 Average Net Income amount falls below the $1,225,000 operating income floor called for in the Agreement, yielding a deficiency of $261,087. Therefore, according to the Agreement, if all of its adjustments to the 1994 operating income figure are correct, Marvel would be entitled to six times that deficiency amount; or, $1,566,524.

The difference between the Average Net Income figure determined by Ernst & Young ($963,913) and the Average Net Income figure determined by LOL ($1,516,752) is largely based on Ernst & Young's determination that the adjusted operating income for 1994 was $149,242. This number was arrived at by reducing the 1994 operating income figure of $1,807,761 that was used by LOL based on a number of downward adjustments. One of these adjustments was a downward adjustment of $537,091 based on Ernst & Young's calculation of uncollectible accounts receivable.

Assumedly, because a number of Ernst & Young's other adjustments to the 1994 operating income are disputed by Snyder Ventures, Marvel's claim seeking a disallowance of Snyder Ventures claim in the amount of $1,321,605 is based only upon the downward adjustment for the accounts receivable. This is the only aspect of the calculation that is affected by the parties' legal dispute as to the methodology that is called for by the Agreement for applying cash receipts to accounts receivable.[3] When the operating income for 1994 is reduced by the $537,091 reduction in accounts receivable, the Average Operating Income for 1992, 1993, and 1994 becomes $1,337,772. This figure is less than the $1,392,000 hurdle specified in section 1.3(c)(ii) for an upward purchase price adjustment. Consequently, Marvel claims that the $784,514 upward adjustment sought by Snyder Ventures must be eliminated. The $537,091 reduction in accounts receivable also impacts the Net Other Assets, reducing that amount by $537,091. Therefore, Marvel contends that when the collection of accounts receivable is applied in accordance with the Agreement as written, a disallowance of $1,321,605 ($537,091 + $748,415) of Snyder Ventures' claims is required. Marvel seeks partial summary judgment to that extent.

---

**3.** Determining what the proper methodology for the calculation of accounts receivable is, according to the Agreement, is a matter of contract interpretation. The other adjustments to 1994 operating income that are disputed by the parties are accounting matters that should be able to be worked out among the accountants.

C. *The Parties' Positions With Respect to the Accounts Receivable Calculation*

The issue presented by Marvel's present motion is which method of applying cash receipts to accounts receivable is proper, according to the terms of the Agreement. As indicated by the results of the LOL and Ernst & Young reports, the treatment of accounts receivable impacts both the Average Operating Income purchase price adjustment contemplated by section 1.3(c) and the Net Other Assets purchase price adjustment contemplated by section 1.3(d) of the Agreement.

In sum, Snyder Ventures, relying on the LOL report, contends that the purchase price should be increased by $1,822,398.33. Because Marvel also owes Snyder the $3,500,00 amount of the promissory note, Snyder Ventures claims seek $5,322,398.33 plus interest. Marvel, on the other hand, relying on the Ernst & Young report, contends that at least 1,321,605 of the Snyder Ventures' claims must be disallowed.[4]

Both parties contend that their adversary's methodology is improper according to the terms of the Agreement. The legal construction of the portion of section 1.3(d)(ii) that governs the treatment of accounts receivable is the issue presented to the court to decide.[5]

1. *Background: Methodologies to Apply Cash Receipts to Accounts Receivable*

To better appreciate the differences in the parties' positions, it will be helpful to review some basic accounting methodologies. Section 1.3(b)(i) of the Agreement states that most aspects of the financial reports are to be calculated using generally accepted accounting principles ("GAAP"). Under GAAP, cash receipts are to be matched to specific invoices, regardless of whether there are older outstanding invoices for that customer. However, in section 1.3(d)(ii) of the Agreement, the parties agreed that for the specific purposes of calculating the accounts receivable that are collected, instead of using GAAP, collections shall be applied first to the oldest outstanding invoice for each customer, unless the customer disputed the invoice.

To illustrate the difference in the application of cash receipts between GAAP and section 1.3(d)(ii), the following example is instructive:

A customer has the following outstanding invoices:

| Date | Invoice # | Amount |
|---|---|---|
| 12/31/94 | 1 | $100 |
| 1/15/95 | 2 | $200 |
| 2/5/95 | 3 | $175 |
| 2/15/95 | 4 | $125 |

If the customer makes a $125 payment on March 31, 1995 and designates that the payment is for invoice # 4, under the Agreement, the parties agreed that $100 is to be applied to pay invoice # 1 (the oldest invoice for that customer) in full and the remaining $25 is then to be applied to invoice # 2 (the next oldest invoice for that

---

4. In addition to the current dispute, which involves the method to use when applying cash receipts, the parties disagree on other matters, including calculations relating to inventory. As Marvel's motion only addresses the application of cash receipts, these other matters are not presently before the court.

5. Although the Agreement provides for a mechanism to resolve disputes in the application of the post-Closing adjustments that consists of submitting the matter to a mutually agreeable "big six" accounting firm, the parties seek the court's guidance on the legal issue of how the contract is to be interpreted and whether parole evidence may be admissible to make that determination.

customer). Under GAAP, the $125 payment would have been applied to invoice # 4.

### 2. *Snyder Ventures' Methodology*

Under Snyder Ventures' methodology for applying payments received after December 31, 1994 (which is incorporated in LOL's report), all payments received by Marvel after December 31, 1994 are applied to pre-December 31, 1994 accounts receivable, even if the payments relate to sales made by Marvel after closing. Thus Snyder Ventures contends that all collections in respect of accounts receivable, whether the receivable arose before December 31, 1994 or afterwards, were intended to be deemed collections of acquired accounts receivable, even if those accounts receivable were not acquired under the Agreement. Snyder Ventures states that this methodology is compelled by the language of section 1.3(d)(ii).

### 3. *Marvel's Methodology*

Marvel claims that this methodology is inconsistent with section 1.3(d)(ii), which states that "collections of Accounts Receivable **"acquired at the Closing"** shall be applied first to the oldest of such Accounts Receivable ...." (emphasis added). Marvel contends that the "acquired at the Closing" language limits the application of this "oldest first" methodology to pre-Closing accounts receivable and excludes any cash receipts acquired after the Closing. The methodology used in the Ernst & Young report is consistent with that urged by Marvel. As Ernst & Young observed in its report:

> Section 1.3(d)(ii) of the Purchase Agreement states "collections of Accounts Receivable *acquired at closing* (emphasis added) shall be applied first to the oldest of such Accounts Receivable" Consistent with section 1.3(d)(ii), the objective of our procedures was to determine that

cash relating to and collected for sales prior to December 31, 1994 were applied to the oldest accounts receivable. The analysis prepared by LOL applied all 1995 cash collections to the oldest receivables although a significant portion of 1995 cash receipts are for 1995 sales and related accounts receivable (i.e. not *acquired* at December 31, 1994).

Thus, in the Ernst & Young report, payments that could be matched to invoices from prior to December 31, 1994 would be applied to the oldest receivables first. Similarly, where a customer's payment could not be attributed to a specific invoice (i.e. there was no way to determine whether the payment should be applied to pre or post-Closing accounts receivable), the payment was to be applied first to the oldest outstanding receivable. However, payments that could be matched to invoices from after December 31, 1994 would be applied to that specific invoice, in accordance with GAAP.

### 4. *Summary of the Parties' Positions*

The purpose of adjusting the purchase price based on later accounts receivable calculations was to ensure that the price paid for Snyder Ventures accounted for how much of the accounts receivable that were outstanding as of the Closing date were actually collected. The parties' methodologies yield significantly different results for the two purchase price adjustments, because under Snyder Ventures' methodology, the value of the accounts receivable calculated for purposes of the purchase price adjustment includes cash receipts that are linked to post-Closing 1995 sales. Under Marvel's methodology, however, the accounts receivable calculated for purposes of the purchase price adjustment does not include post-Closing 1995 sales.

The differences in the two reports arise, in large part, from the use of different methods to apply accounts receivables collections. The parties—and the two reports—disagree as to how to treat invoices that can be matched to specific post-Closing accounts. Snyder Ventures contends that such invoices must be applied using the "oldest first" methodology of section 1.3(d)(ii). Marvel claims, however, that such invoices do not fall within the scope of section 1.3(d)(ii) because they are not "Accounts Receivable acquired at the Closing." Therefore, Marvel contends that such invoices must be applied using the GAAP methodology described above.

## II. *DISCUSSION*

### A. *Rules of Contract Construction*

■ The Agreement, pursuant to section 7.8, is to be governed and construed in accordance with New York law. Generally speaking, in interpreting a contract, courts should look to the contract as a whole and should not adopt an interpretation that will render a provision superfluous or without force. Additionally, where there are both general and specific provisions on the same matter, the specific provisions will control. *Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 626 N.Y.S.2d 174, 177 (N.Y.App.Div.1995). Thus, under New York law, a construction that "gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation." *Id.*

■ When an agreement is complete and unambiguous, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990). Thus, the admissibility of parol evidence to vary or contradict the terms of a written contract requires a determination that the contract either (i) fails to express the entire agreement of the parties or (ii) is otherwise ambiguous. *See In re Primex Int'l Corp. v. Wal–Mart Stores, Inc.*, 89 N.Y.2d 594, 657 N.Y.S.2d 385, 679 N.E.2d 624, 627 (1997); *Zugarek v. Walck*, 54 A.D.2d 1074, 1075, 388 N.Y.S.2d 756 (4th Dept.1976).

■ When a contract is determined to be ambiguous, parol evidence is admissible to ascertain "the intention of the parties ... in the light of the surrounding facts and circumstances." *Tobin v. Union News Co.*, 18 A.D.2d 243, 245, 239 N.Y.S.2d 22 (1963), *aff'd.* 13 N.Y.2d 1155, 247 N.Y.S.2d 385, 196 N.E.2d 735 (1964). A contract may be ambiguous if it is susceptible to two or more reasonable interpretations, it may be ambiguous. *See* 17A Am. Jur. 2D Contracts § 338 (1991). Naturally, however, a court need not find that a contract is ambiguous merely because the parties dispute the meaning of its terms.

### B. *The Parties' Positions as to Interpretation of the Agreement*

#### 1. *Snyder Ventures' Position*

■ Snyder Ventures does not dispute that the written Agreement expresses the entire agreement of the parties. Indeed, the Agreement at issue contains a broad integration clause. That clause is found at section 7.7 of the Agreement, which states that:

> This Agreement, the schedules thereto and the Related Instruments constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supercede all contemporaneous and prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof ....

The purpose of such a clause, under New York law, is "to require the full application of the parol evidence rule in order to bar the introduction of evidence to vary the terms of the writing." *In re Primex Int'l Corp.*, 657 N.Y.S.2d 385, 679 N.E.2d at 627.

Snyder Ventures argues however that, because the terms of the Agreement regarding the calculation of accounts receivables are ambiguous, extrinsic evidence regarding Ivan Snyder's intent should be admissible to determine the proper meaning of the disputed terms. According to Snyder's affidavit, "the terms of Section 1.3(d)(ii) ... require[ ] all cash receipts collected after December 31, 1994, to be applied to the oldest invoice for each customer, regardless of whether the payment could be matched to a specific invoice." Snyder Ventures seeks to rely on this statement regarding the intended effect of section 1.3(d)(ii) to support the methodology it used to calculated accounts receivable.

Snyder Ventures submits that it is proper to rely on this parol evidence because the Agreement is ambiguous as to how cash receipts are to be applied. Snyder Ventures first argues that reading sections 1.3(b)(i) and 1.3(d)(ii) of the Agreement together compels the conclusion that Marvel's methodology for applying cash receipts to accounts receivable is incorrect. Under Marvel's methodology, cash receipts received after December 31, 1994, if possible, would be matched to a specific invoice. Snyder Ventures argues that while section 1.3(b)(i) generally provides that under the Agreement, the financial statements are to be calculated using GAAP (i.e. matching receipts to specific invoices regardless of whether older outstanding invoices exist for that customer account), section 1.3(d)(ii) provides that for the specific calculation of the accounts re-

ceivable the collection of accounts receivable "shall be applied first to the oldest of such Accounts Receivable." Thus, according to Snyder Ventures, the parties agreed that this calculation was to be done using the "oldest first" accounting method and not GAAP. Thus, based on Snyder's affidavit, Snyder Ventures contends that insofar as Marvel's calculations match specific invoices in the manner contemplated by GAAP, that methodology renders section 1.3(d)(ii) meaningless.

Snyder Ventures then argues that because Marvel's interpretation renders meaningless the language in 1.3(d)(ii) that addresses how cash receipts are to be applied, that section of the Agreement cannot be said to be clear and unambiguous. According to Snyder Ventures, an equally reasonable interpretation of that section is the alternative interpretation that it urges is correct: it requires the application of cash receipts to the oldest open invoice for each account.

Last, Snyder Ventures states that in addition to disputing the methodology used by Marvel it also disputes whether the application of that methodology was done correctly. Snyder Ventures thus asserts that even if the court were to find that Marvel's interpretation of the Agreement is correct as a matter of law, Marvel is only entitled to a judgment that its methodology is correct, but is not, at this stage, entitled to a judgment which would reduce Snyder Ventures' claim by $1,321,605.

### 2. *Marvel Enterprises' Position*

Marvel asserts that the plain language of section 1.3(d)(ii) mandates that the methodology used to calculated collections of accounts receivable by Marvel is correct and that the methodology used by Snyder Ventures is incorrect. Further, in response to Snyder Ventures' arguments, Marvel contends that the Agreement is

unambiguous, and that therefore parol evidence regarding the parties' intent at the time of contracting is not relevant to the court's determination of the meaning of the terms in the Agreement that are facially clear.

Marvel claims that the language of section 1.3 plainly reveals an agreement designed to require the purchaser to pay for the accounts receivable actually acquired at the Closing, but only to the extent such accounts were collected. Therefore, cash receipts that are tied to sales made after the Closing, should not be included in the calculation for acquired accounts receivable.

In support of its position, Marvel points to the "acquired at the closing" language in the sentence of section 1.3(d)(ii) that states that "collections of accounts receivable **acquired at the Closing** shall be applied first to the oldest of such Accounts Receivable ...." (emphasis added). Marvel claims that the methodology employed by Snyder Ventures gives no effect to the language "acquired at the Closing." Based on this limitation, Marvel argues that the "oldest first" methodology for collections of accounts receivable that is set forth in section 1.3(d)(ii) applies only to accounts receivable that were acquired at the Closing, and that all receipts that are linked to sales made after the Closing are not to be calculated in this manner. Those receipts are to be calculated in accordance with GAAP and section 1.3(b)(i)—by matching the receipts to specific invoices.

### C. The Court's Decision

 Section 1.3(d)(ii) states that "collections of Accounts Receivable "acquired at the Closing" shall be applied first to the oldest of such Accounts Receivable ...." Snyder Ventures urges an interpretation which reads out the language "acquired at the Closing" and instead seeks to apply the "oldest first" methodology to *all* collections of accounts receivable, independent of whether those accounts receivable were acquired at the Closing or instead were derived from post-Closing sales made by Marvel. Under its interpretation of the Agreement, as supported by Snyder's affidavit, income that is generated after the acquisition should be applied towards pre-acquisition accounts receivable; this yields an upward adjustment to the purchase price.

The only reading of section 1.3(d)(ii) that supports Snyder Ventures' position is that although 1.3(d)(ii) states that "collections of Accounts Receivable **acquired at the Closing** shall be applied first to the oldest of such Accounts Receivable," it actually means that all subsequent collections of Accounts Receivable shall be applied first to the oldest of such Accounts Receivable. This cannot be the case, because this construction ignores the limiting language "acquired at the Closing."

Snyder Ventures, in its answering brief, argues that its position does not read the "acquired at the Closing" language in Section 1.3(d)(ii) out of the contract. It states that "the 'acquired at the Closing' language merely identifies the invoices to which subsequent cash receipts are to be applied." By this argument, the court assumes, Snyder Ventures is asserting that the "acquired at Closing" language is a modifier and was not intended to have substantive limiting meaning. A plain reading of the contract belies this assertion. There is no viable reason for the court to assume that this language is superfluous and may simply be ignored. Rather, as the court reads section 1.3(d)(ii), the phrase in context modifies the immediately preceding phrase "Accounts Receivable" and, for the purposes of provision 1.3(d)(ii), limits the universe of Accounts Receivable to those in existence

as of the Closing in determining which collections after the Closing can be applied for purchase price adjustment purposes. The language of this provision and the acquisition context in which it was used reflects an agreement designed to require the purchaser to pay for the accounts receivable actually acquired at the closing, to the extent such accounts were collected. Accordingly, the provision does not contemplate the inclusion of post-Closing receipts in this calculation.

Snyder Ventures next contends that if the court were to accept Marvel's interpretation of section 1.3(d)(ii), then the phrase "shall be applied first to the oldest of such Accounts Receivable" would have no import and would be rendered meaningless, because it would make no difference for purposes of adjusting the purchase price whether payments in respect of sales made before the Closing were applied to the oldest or the newest of such pre-Closing accounts receivable. This contention, however is incorrect. Under Marvel's interpretation of section 1.3(d)(ii), where a receipt can be matched to a specific post-Closing sale, it is applied to that sale. All other receipts are applied "first to the oldest of such accounts receivable" as contemplated by section 1.3(d)(ii). Moreover, if a customer's payment could not be matched to a specific invoice and there was thus no way to determine whether the payment should be applied to "Accounts Receivable at the Closing" or to accounts receivable arising as a result of a post-Closing sale, the payment is to be applied to the oldest outstanding receivable. The Ernst & Young report indicates that section 1.3(d)(ii) was applied in this manner towards $210,030 of customer payments that could not be matched to specific post-Closing invoices. If the calculations were done according to GAAP and not according to section 1.3(d)(ii), many of those pay-

ments would not have been applied to pre-Closing receivables.

Therefore under Marvel's methodology, in accordance with Section 1.3(d)(ii), all sales receipts that could have been pre-Closing sales are applied to the oldest invoice first instead of being matched to specific invoices in accordance with GAAP. Only those receipts that definitively are not "accounts receivable acquired at the Closing" are not calculated in this manner. With respect to these receipts—receipts which can be matched to sales that occurred after the acquisition of Snyder Ventures—the default provision of 1.3(b)(i) is used and the receipts are matched to invoices in accordance with GAAP.

Thus, the court concludes that the interpretation urged by Marvel does not render section 1.3(d)(ii) meaningless. Rather, it is the construction that is mandated by the plain language of the Agreement read as a whole.

### III. CONCLUSION

▇▇▇ The court finds that Snyder Ventures' proffered construction is not reasonable because it ignores the limiting language "acquired at the Closing." Instead, the court concludes that section 1.3(d)(ii) of the Agreement is unambiguous and requires the application of cash receipts towards accounts receivable to be conducted in the manner urged by Marvel. Because the court finds that the Agreement is unambiguous, Snyder Ventures may not rely on parol evidence—in the form of Ivan Snyder's affidavit—to support its contention that the Agreement did not accurately express the parties' intentions.

Based on its determination that the clear language of the Agreement supports Marvel's methodology for calculating accounts receivable under the Agreement, the court will grant Marvel's motion for partial summary judgment. However,

based on what the parties have reported to the court, the court's order need not implement this legal finding by reducing Snyder Ventures' claims by $1,321,605.[6] Rather, the parties and their accountants now should be able to use the court's interpretation of the disputed provision in the contract to perform the calculations of the appropriate purchase price adjustments. To the extent that the parties have disputes about the correctness of the calculations themselves, they can use the dispute resolution mechanism set forth in section 1.3(b)(iii) of the Agreement to resolve the issue.

---

6. That is the amount that Marvel, through its accountants, has calculated should be reduced, based upon its application of the appropriate methodology. However, Snyder stated in its brief that even if the court finds that Marvel's methodology was correct, as the court now has, the court should not reduce the claims by the amount sought be Marvel, because Snyder still disputes the correctness of the calculations done using that methodology.